

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-16-00036-CV

ESTATE OF JULIA HOPE GERALD
HOOD, DECEASED

----------

FROM PROBATE COURT NO. 2 OF TARRANT COUNTY
TRIAL COURT NO. 2012-PR02962-2-F

----------

## MEMORANDUM OPINION[1]

----------

In this interlocutory appeal, Appellants David Ringer and the Ringer Law Firm appeal from the trial court's order denying their special appearance. *See* Tex. Civ. Prac. & Rem. Code Ann. § 51.014(a)(7) (West Supp. 2016). We

---

[1]*See* Tex. R. App. P. 47.4.

reverse and render judgment dismissing Appellees' claims against Appellants for lack of personal jurisdiction.

## I. INTRODUCTION

On July 18, 2006, Julia Hope Hood died. She was a Mississippi resident at the time of her death, and she left a will naming her niece, Lola Rose Gerald Webb, as executrix of her estate. With the exception of a few special bequests of personal property, Julia's will directed that as soon as possible after her death, Webb convert her estate to cash and then distribute the cash estate to the beneficiaries named in the will. Julia's estate at the time of her death included an approximately fifteen-acre parcel of real property situated in Tarrant County, Texas (Texas Property), and her will named several individual and corporate beneficiaries who were scattered across the states of Mississippi, Indiana, South Carolina, Tennessee, Ohio, and Texas. The Appellees here—James Hood; Sowers of Seed, a Charitable Corporation; John "Jackie" Hood; Patricia Hood Ritchie; Billy Ray Hood; Tim Hood; and Cheryl Hood Key—are all of the Texas beneficiaries named in Julia's will.

The probate of Julia's estate took several years and involved court proceedings in both Mississippi and Texas. Along the way, disputes between Appellees and Webb emerged, particularly with respect to Webb's handling of the Texas property, and Appellees eventually sued her in a Texas court as a result. But Appellees' dispute with Webb is not what this appeal is about; that particular dispute was settled in September 2014 and dismissed. This appeal is

about another case Appellees filed in a Texas court related to the probate of Julia's will. In March 2015, Appellees sued Appellants, the Mississippi lawyer and law firm who assisted Webb in probating Julia's will in Mississippi. Appellees allege that Ringer assisted in wrongfully forcing them to release their claims against Webb before they could receive their inheritance. They claim that Ringer's conduct constituted fraudulent inducement, tortious interference with inheritance, and extortion.[2] The sole issue we must decide is whether a Texas court has jurisdiction to hear those claims.

## II. BACKGROUND AND PROCEDURAL FACTS

We begin in Mississippi. After Julia's death, Webb hired Ringer to assist her in probating Julia's will. Ringer is a lawyer who is licensed to practice law in Mississippi, and he operates a law firm that does business as the Ringer Law Firm. The Ringer Law Firm has three office locations, all of which are situated in Mississippi, and it does business exclusively in Mississippi. Ringer initiated probate proceedings in a Mississippi chancery court (Mississippi Probate Proceeding), which admitted Julia's will to probate on November 1, 2006. During the course of the Mississippi Probate Proceeding, Ringer filed petitions on Webb's behalf asking the Mississippi chancery court to authorize her to manage the Texas property in various respects. The Mississippi chancery court granted those petitions.

---

[2]Appellees claim that the Ringer Law Firm is liable for Ringer's allegedly wrongful conduct based upon the theory of respondeat superior.

3

Relying on the Mississippi chancery court's orders, Webb took substantial action with respect to the Texas Property. She retained a Texas attorney, who advised her about the title to the surface and mineral estates, the potential of granting a pipeline easement on the surface estate, and the potential of granting an oil and gas lease. She secured two appraisals in 2009, executed an oil and gas lease in November 2009, extended that lease in May 2012, secured another appraisal in November 2012, entered into multiple listing agreements with a Texas realtor to sell the property, and marketed the property for sale. She did all of those things without ever being appointed as representative of Julia's Texas estate by a Texas court or informing Appellees of her actions.

Appellees eventually filed an application for ancillary probate of a foreign will in the Tarrant County, Texas probate court, apparently in November 2012 (Texas Probate Proceeding). *See* Tex. Est. Code Ann. § 501.001 (West Supp. 2016), § 501.002 (West 2014) (formerly Tex. Prob. Code. Ann. §§ 95(a), (b)). They then filed four ancillary suits against Webb in the Texas Probate Proceeding, advancing claims related to her alleged unauthorized handling of the Texas Property.

By late September 2013, all of the Appellees except Billy had retained a Mississippi lawyer to appear and represent their interests in the Mississippi Probate Proceeding. On October 11, 2013, while Appellees' claims against Webb were still pending in the Tarrant County probate court, Ringer filed a petition in the Mississippi chancery court seeking to close Julia's estate. The

4

petition stated that other than the Texas Property, the only remaining assets in Julia's estate were two checking accounts containing a little more than $125,000. Ringer sought authority from the Mississippi chancery court to withhold those remaining assets until Julia's beneficiaries delivered a full and final release of any claims they may have had against Webb as a result of her handling of Julia's estate, specifically including any claims arising under the laws of Mississippi or the laws of Texas. Ringer's petition to close Julia's estate was set for hearing on December 2, 2013.

Ringer served the petition and hearing notice on the then-represented Appellees by mailing the petition and notice to their counsel of record at his Mississippi mailing address. Because Billy was not yet represented, Ringer directly mailed him a copy of the October 11, 2013 petition, hearing notice, and a draft release that he could execute to release any claims he may have against Webb as a result of her handling of Julia's estate. Ringer also included a cover letter which stated, in pertinent part, that a release was enclosed that Billy would need to date, sign, have notarized, and return to Ringer in an enclosed postage-paid envelope, and which would "be held until [Billy's] next distribution check issue[d] from . . . Webb." Within a few days after he received this correspondence, Billy retained a Texas lawyer to represent him. By November 27, 2013, Billy had also joined with the other Appellees in retaining a Mississippi lawyer, who filed Appellees' response to Ringer's October 11, 2013 petition in the Mississippi Probate Proceeding, and who appeared on their behalf at the

December 2, 2013 hearing. At the hearing, the Mississippi chancery court granted Ringer's petition to close Julia's estate, and on January 8, 2014, it entered a final judgment. The judgment provided, in part, that "[u]pon the receipt of Releases [releasing any claims against Webb for her handling of Julia's estate] from each [e]state beneficiary, . . . that [e]state beneficiary is to receive the distribution" set forth in the final judgment.

After the Mississippi chancery court entered its final judgment, Ringer mailed to Appellees' Mississippi attorney at his Mississippi mailing address correspondence stating, "Should any of your clients seek to act in accordance with the Judgment entered on January 8, 2014, enclosed are the Releases which would need to be exchanged for [distribution] checks." Ringer enclosed proposed releases for each Appellee to execute. The record reflects, however, that Appellees did not execute the releases at that time, and they continued litigating their claims against Webb in the Texas Probate Proceeding. During the course of that litigation, the Texas probate court entered an order on July 7, 2014, in which it, among other things, questioned the validity of the portion of the Mississippi chancery court's January 8, 2014 final judgment requiring Appellees to execute a release of claims against Webb in order to receive the final distribution from Julia's estate. Then, on August 29, 2014, while represented by counsel, Billy executed a release of claims against Webb.[3] Litigation of

---

[3]We observe that the form of the release that Billy ultimately signed differs in a few nonsubstantive ways from the release that Ringer included in the

6

Appellees' claims against Webb ended shortly thereafter when, in September 2014, a court-approved settlement agreement was reached.

Having resolved their claims against Webb, Appellees then filed this suit against Appellants in the Texas probate court for fraudulent inducement, tortious interference with inheritance, and extortion. In response, Appellants filed a special appearance, arguing that the Texas probate court lacked personal jurisdiction over them. The trial court referred Appellants' special appearance to an associate judge, who denied it. *See* Tex. Gov't Code Ann. § 54A.207 (West 2013). Appellants thereafter requested a de novo hearing before the trial court, which held an evidentiary hearing on January 13, 2016. *See id.* at § 54A.216.

At the evidentiary hearing, Billy testified that he was a life-long Texas resident; that he had never met Ringer or talked to him on the telephone; that he had never met anyone else from the Ringer Law Firm or talked to anyone else from the Ringer Law Firm on the telephone; and that no one from the Ringer Law Firm had ever come to Texas to meet with him. He further testified that other

---

October 11, 2013 correspondence that he mailed to Billy at his Texas mailing address. For instance, the release Ringer included in the October 11, 2013 correspondence stated that Billy would be releasing Webb from all claims "arising under the laws of all jurisdiction [sic], specifically including Texas and Mississippi, whatsoever . . . ." The release that Billy ultimately signed, however, stated that he would be releasing Webb from all claims "arising under the laws of all jurisdictions, whatsoever, specifically including Texas and Mississippi . . . ." Moreover, the release Ringer included in the October 11, 2013 correspondence was double-spaced, whereas the release Billy signed was single-spaced. And the font of the release provided in the October 11, 2013 correspondence differs from that of the release Billy signed.

7

than exchanging some emails with Ringer that were unrelated to the claims in this lawsuit, the only contact he ever had with Ringer or the Ringer Law Firm was one correspondence that Ringer mailed to him at his Texas mailing address while the Mississippi Probate Proceeding was still pending. That correspondence included a letter from Ringer that stated, in pertinent part, as follows: "Dear Estate Beneficiaries: Recipients of this letter are [e]state [b]eneficiaries of [Hood's estate]. Enclosed: . . . [a] Release which you would need to date, sign, have notarized, and remit in the enclosed . . . envelope. Same will be held until your next distribution check issues from . . . Webb."[4] A proposed release of Webb was included, as well as a postage-paid return envelope addressed to the Ringer Law Firm in Florence, Mississippi. Billy testified that his understanding of the correspondence was that if he did not sign the release, he would be in violation of the law and would not receive his inheritance. He testified that he ultimately signed the release in front of a notary in Texas.

The trial court also admitted an affidavit from Ringer. He testified in his affidavit that he was a Mississippi-licensed attorney who had resided in Mississippi for the previous twenty years. He stated that he had never been

---

[4]In addition to containing Billy's name and Texas mailing address, the addressee portion of this letter also included the names and mailing addresses of the other unrepresented, non-Texas beneficiaries of Julia's estate in Indiana, South Carolina, Ohio, Mississippi, and Tennessee, indicating that Ringer had sent the same correspondence directly to those beneficiaries as well.

8

licensed to practice law in Texas, had never had a law office in Texas, had never been registered to do business in Texas, and had never had a registered agent in Texas. He further testified that he did not own property in Texas, had never paid taxes in Texas, and with the exception of this lawsuit, had never sued or been sued in Texas. Additionally, he stated that he had never represented any client in proceedings pending before a Texas court and that all of the legal services he and the Ringer Law Firm provided to Webb were performed in Mississippi. With respect to the Ringer Law Firm, Ringer testified that its offices are all situated in Mississippi, that it does business solely in Mississippi, that it does not solicit business or employees from Texas, and that it does not own any property in Texas. He stated that the Ringer Law Firm had never paid any taxes in Texas, had never been sued in Texas with the exception of this lawsuit, and that none of its employees have ever been licensed to practice law in Texas.

After considering this evidence, the trial court denied Appellants' special appearance, finding that it had specific jurisdiction over Appellants, though it declined to file findings of fact and conclusions of law. Appellants timely filed this interlocutory appeal. *See* Tex. Civ. Prac. & Rem. Code Ann. § 51.014(a)(7). In one issue, Appellants contend that the trial court erred by denying their special appearance because they negated all possible grounds for personal jurisdiction.

9

## III. STANDARDS AND BURDENS IN REVIEW OF PERSONAL JURISDICTION

### A. APPELLATE PRISM

The standards of review and the burdens of proof applicable to our review of a trial court's ruling on a special appearance are well established. Whether a trial court has personal jurisdiction is a question of law. *BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002). A plaintiff has the initial burden to plead sufficient allegations to bring a nonresident defendant within the provisions of the Texas long-arm statute. *Kelly v. Gen. Interior Constr., Inc.*, 301 S.W.3d 653, 658 (Tex. 2010); *Retamco Operating, Inc. v. Republic Drilling Co.*, 278 S.W.3d 333, 337 (Tex. 2009). Once a plaintiff sufficiently pleads such jurisdictional allegations, the burden shifts to the defendant to negate the bases of personal jurisdiction asserted by the plaintiff. *Kelly*, 301 S.W.3d at 658; *Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 574 (Tex. 2007).

In determining whether the nonresident defendant sufficiently negated the pleaded bases for personal jurisdiction, the trial court frequently must resolve questions of fact. *BMC Software*, 83 S.W.3d at 794. While we review de novo the trial court's legal conclusion that personal jurisdiction exists, any supporting findings of fact are reviewed for factual and legal sufficiency. *Id.* Because the trial court did not enter findings of fact and conclusions of law here, we infer that the trial court made all fact findings that have support in the record and that are necessary to uphold its ruling. *See Moki Mac*, 221 S.W.3d at 574; *BMC Software*, 83 S.W.3d at 795. However, when, as here, the appellate record

10

includes the reporter's and clerk's records, these implied fact findings are not conclusive and may be challenged for legal and factual sufficiency. *BMC Software*, 83 S.W.3d at 795. If the trial court's inferred findings are supported by sufficient evidence, we must decide as a matter of law whether those facts negate all bases for personal jurisdiction. *Id.* at 794.

## B. LONG-ARM STATUTE AND DUE PROCESS

A special appearance challenges the trial court's personal jurisdiction over a defendant. Texas courts may not exercise personal jurisdiction over a nonresident defendant unless federal due process requirements and the Texas long-arm statute are satisfied. Tex. Civ. Prac. & Rem. Code Ann. §§ 17.041–.042 (West 2015); *Helicopteros Nacionales de Colom., S.A. v. Hall*, 466 U.S. 408, 412–13 & n.7, 104 S. Ct. 1868, 1871 & n.7 (1984). The Texas long-arm statute and the requirements of due process are coextensive; thus, the long-arm statute is satisfied if the exercise of personal jurisdiction comports with federal due process. *See Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.*, 815 S.W.2d 223, 226 (Tex. 1991). Federal due process is satisfied if (1) the nonresident defendant has "minimum contacts" with Texas and (2) the exercise of personal jurisdiction over the nonresident defendant does not offend "traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Wash., Office of Unemp't Comp. & Placement*, 326 U.S. 310, 316, 66 S. Ct. 154, 158 (1945).

11

## 1. Minimum Contacts

Minimum contacts are present when a nonresident defendant "purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S. Ct. 1228, 1240 (1958). In determining purposeful availment, we consider (1) the defendant's own actions but not the unilateral activity of another party, (2) whether the defendant's actions were purposeful rather than "random, isolated, or fortuitous," and (3) whether the defendant sought "some benefit, advantage, or profit by 'availing' itself" of the privilege of doing business in Texas. *Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 785 (Tex. 2005). The nonresident defendant's contacts are considered as a whole and not in isolation, focusing on the quality and not the quantity of the contacts. *Retamco Operating*, 278 S.W.3d at 339; *Guardian Royal*, 815 S.W.2d at 230 n.11.

A defendant's contacts may give rise to two types of personal jurisdiction: specific and general jurisdiction. *Moki Mac*, 221 S.W.3d at 575–76. When specific jurisdiction is asserted, we focus on the relationship between the defendant, the forum, and the litigation. *Id.* In short, the asserted cause of action must "arise from or relate to" the nonresident defendant's contacts with the forum. *Guardian Royal*, 815 S.W.2d at 228. General jurisdiction, however, is a more demanding test to meet than specific jurisdiction. General jurisdiction is not dispute dependent but requires continuous and systematic contacts. *Helicopteros*, 466 U.S. at 414–16, 104 S. Ct. at 1872–73.

## 2. Fair Play and Substantial Justice

If minimum contacts are present, the nonresident defendant then bears the burden to establish that the exercise of personal jurisdiction would offend traditional notions of fair play and substantial justice. *Knight Corp. v. Knight*, 367 S.W.3d 715, 726 (Tex. App.—Houston [14th Dist.] 2012, orig. proceeding). When the nonresident defendant has purposefully established minimum contacts with the forum state, it will be rare that the exercise of jurisdiction over the nonresident defendant would not comport with fair play and substantial justice. *Guardian Royal*, 815 S.W.2d at 231.

## IV. APPLICATION

The trial court's order denying Appellants' special appearance expressly states that it found specific jurisdiction over Appellants. Additionally, the parties agree that neither Appellant has sufficient contacts with Texas for a Texas court to exercise general jurisdiction over them. Thus, because there is no dispute that Appellants' contacts with Texas are insufficient to support general jurisdiction, we confine our discussion to analyzing whether specific jurisdiction exists. *See Abruzzo, LLC v. Walesa*, No. 04-12-00747-CV, 2013 WL 1225626, at *3 (Tex. App.—San Antonio Mar. 27, 2013, no pet.) (mem. op.); *Appa Tech. Corp. v. Mitchell*, 225 S.W.3d 812, 817 n.1 (Tex. App.—Dallas 2007, pet. denied).

Looking to Appellees' pleadings, the only basis upon which Appellees contend that Texas courts have specific jurisdiction over Appellants is that they committed torts, in whole or in part, in Texas. *See* Tex. Civ. Prac. & Rem. Code

13

Ann. § 17.042(2). Appellants do not contend that Appellees' allegations are insufficient to satisfy the requirements of the Texas long-arm statute. *See id*.; *Moki Mac*, 221 S.W.3d at 574–75; *Michiana*, 168 S.W.3d at 788. Appellants contend, however, that a Texas court's exercise of specific jurisdiction over them in this case would not comport with due process because (1) they do not have sufficient minimum contacts with Texas, (2) they do not have any contacts with Texas that relate to the operative facts of Appellees' claims, and (3) exercising jurisdiction over them would offend traditional notions of fair play and substantial justice. Because we agree with Appellants that they do not have sufficient Texas contacts to support specific jurisdiction, we need not address their other arguments. *See* Tex. R. App. P. 47.1.

## A. MINIMUM CONTACTS

Considering only Appellants' own conduct and not the unilateral activity of Appellees or any other third person, as we must, *see Michiana*, 168 S.W.3d at 785, the record reflects only one contact that could potentially support specific jurisdiction: the correspondence Ringer mailed to Billy at his Texas mailing address. We conclude that this is an insufficient contact with Texas to support specific jurisdiction.

The facts of this case are analogous to those in *Sussman v. Old Heidelburg, Inc.*, No. 14-06-00116-CV, 2006 WL 3072092, at *1, *3 (Tex. App.— Houston [14th Dist.] Oct. 31, 2006, no pet.) (mem. op.). In *Sussman*, Northern Leasing Systems, Inc. (Northern), a New York corporation, had agreements to

14

lease credit card verification equipment to Old Heidelberg, Inc. d/b/a Old Heidelberg Inn (Old Heidelberg) and Shamu Lee's, Inc. d/b/a Wellbread Bakery (Wellbread). *Id.* at *1. Karim Zangeneh personally guaranteed payment on the Old Heidelberg lease, and Jehangir Irani did likewise on the Wellbread lease. *Id.* The Old Heidelberg and Wellbread leases evidently fell into default, and Northern retained Joseph Sussman, a New York attorney, to assist in collecting the money owed under the leases. *See id.* To that end, Sussman initiated separate debt collection suits against Zangeneh and Irani in a New York court. *Id.* Sussman also mailed a demand letter and a draft of the complaint directly to Zangeneh in Texas. *Id.* at *1, *3.

Old Heidelberg and Wellbread filed suit against Sussman in a Texas court, alleging that Sussman's mailing of the demand letter and draft complaint to Zangeneh was fraudulent and that they had relied upon it in Texas to their detriment. *See id.* at *1, *4. Sussman filed a special appearance, which the trial court denied. *Id.* at *1. On appeal, Sussman argued that mailing the demand letter and draft complaint to Texas did not constitute purposeful availment but was instead merely a fortuitous contact with Texas. *See id.* at *2 & n.4. In its minimum-contacts analysis, the court first noted that Sussman's act of mailing the demand letter and draft complaint to Texas was not attributable to him personally because he performed it in his capacity as attorney for a nonresident corporation in connection with foreign litigation. *Id.* at *3 (citing *Ross F. Meriwether & Associates, Inc. v. Aulbach*, 686 S.W.2d 730, 731 (Tex. App.—San

15

Antonio 1985, no writ)).  The court additionally observed that Sussman's act of mailing the demand letter and draft complaint to Texas did not constitute purposeful availment for the same reason:  because he performed it in New York in representation of his New York client in connection with pending New York litigation.  *Id.* at *3.  Given that context, the court held that the receipt of the demand letter and draft complaint in Texas was merely a fortuitous contact with Texas because Sussman had no control over the location of his client's debtors. *Id.*

The same reasoning applies here.  The record reflects that Ringer's only contact with Texas was made in his capacity as Webb's attorney in connection with the Mississippi Probate Proceeding.  In that capacity, he filed a petition to close Julia's estate, wherein he asked the court to authorize Webb to withhold each beneficiary's share of the approximately $125,000 remaining in Julia's estate until they released her from all liability relating to her conduct in handling Julia's estate in both Mississippi and Texas.  Because Billy had not at that time joined with the other Appellees in retaining Mississippi counsel to represent him in the Mississippi Probate Proceeding, Ringer mailed the petition to close, notice of hearing, proposed release, and cover letter directly to him at his Texas mailing address.  Given this context, Ringer's sole contact with Texas occurred merely because of the fortuitous circumstances that Billy happened to be one of Hood's beneficiaries; that unlike the other Appellees, Billy had not yet retained

16

Mississippi counsel when Ringer filed the petition to close Julia's estate; and that Billy happened to live in Texas, circumstances over which Ringer had no control.[5]

Appellees contend that the correspondence Ringer sent to Billy was part of a scheme that Ringer designed to induce Appellees to release any claims they had against Webb, to force them to dismiss their claims against her that were pending in the Texas probate court, and to circumvent judicial oversight of Julia's Texas estate by the Texas probate court. They argue that in order to accomplish this plan, Ringer mailed the correspondence to Billy, which falsely represented that he was not entitled to receive his inheritance until he released any claims he may have had against Webb. They maintain that Billy relied on that

---

[5]The conclusion that Ringer's contact with Texas was merely fortuitous rather than purposeful is further supported by two additional considerations. First, as we noted above, in addition to Appellees, Julia's will named several non-Texas beneficiaries, who are not parties to this appeal, and who, like Billy, had not retained counsel in the Mississippi Probate Proceeding. The cover letter Ringer included in the October 11, 2013 correspondence he mailed to Billy indicated that Ringer had mailed the exact same correspondence and enclosures directly to each of Julia's non-Texas beneficiaries residing in Mississippi, Indiana, South Carolina, Tennessee, and Ohio. Thus, had Billy resided in one of those states rather than Texas, Ringer presumably would have interacted with him the exact same way. *See Searcy v. Parax Res., Inc.*, 496 S.W.3d 58, 74–75 (Tex. 2016) (observing that the fact that nonresident defendant would have conducted itself similarly in communicating with foreign corporation's Texas-based employees regardless of their geographical location supports conclusion that nonresident defendant "did not purposefully avail itself of the benefits, privileges, or profits of engaging with Texas" merely by communicating with foreign corporation's Texas-based employees). Second, after Billy joined the other Appellees in retaining Mississippi counsel, and after the Mississippi chancery court entered its final judgment, Ringer forwarded additional correspondence and releases to Appellees' Mississippi counsel and did not directly contact any individual Appellee.

17

misrepresentation in Texas. And they allege that Ringer's correspondence to Billy forms a "crucial, integral, and substantial" part of their tort claims against Appellants. Appellees argue that these allegations are sufficient to support specific jurisdiction. However, to the extent that Appellees argue that specific jurisdiction exists in this case because Ringer directed a tort at a Texas resident, that argument is foreclosed by *Michiana*. *See Michiana*, 168 S.W.3d at 788–92 (holding that allegation or evidence that nonresident defendant directed a tort at Texas resident insufficient to support specific jurisdiction).

Appellees attempt to distinguish *Michiana* by pointing out that in that case it was the Texas resident who initiated the communication with the nonresident defendant, whereas in this case it is the nonresident defendant who initiated the communication with the Texas resident. However, Appellees cite no authority for the proposition that the supreme court's rejection of the directed-a-tort theory of specific jurisdiction in *Michiana* turned upon who initiated the communication in which the allegedly tortious misrepresentation was made. The *Michiana* court expressly disapproved of the notion that "specific jurisdiction turns on whether a defendant's contacts were tortious rather than the contacts themselves." *Id.* at 792. We have examined Ringer's sole contact with Texas and concluded that it does not meet the purposeful-availment standard. That conclusion does change merely because of Appellees' allegation that Ringer's contact was tortious. *Id.* at 788–92. Nor is our conclusion altered by Appellees' allegations that Ringer's contact with Texas forms a "crucial, integral, and substantial" part of their tort

18

claims against Appellants. The supreme court recently rejected the notion that such an allegation is sufficient to confer personal jurisdiction over a nonresident defendant. *See Searcy*, 496 S.W.3d at 70–71 (expressly rejecting dissent's argument that "'if a nonresident defendant's purposeful activities within Texas are the crux of the tort claim, Texas courts have jurisdiction' over that tort claim"). We therefore find Appellees' attempt to distinguish *Michiana* unavailing.

## B. Fair Play and Substantial Justice

Because we have concluded that sufficient minimum contacts are not present for a Texas court to assert personal jurisdiction over Appellants, we need not address whether the exercise of personal jurisdiction would offend traditional notions of fair play and substantial justice. *See, e.g.*, *Wilson v. Belin*, 20 F.3d 644, 650 n.7 (5th Cir.), *cert. denied*, 513 U.S. 930 (1994); *Grand Aerie Fraternal Order of Eagles v. Haygood*, 402 S.W.3d 766, 782 (Tex. App.—Eastland 2013, no pet.) (op. on reh'g). *See generally* Tex. R. App. P. 47.1.

## V. CONCLUSION

After considering Appellants' contacts with Texas as a whole and under the appropriate sufficiency standards of review, we conclude that they did not purposefully avail themselves of the privilege of conducting activities within Texas. Thus, they do not have sufficient contacts with Texas for a Texas court to exercise specific jurisdiction over them. We therefore sustain Appellants' issue, reverse the trial court's order denying their special appearance, and render

19

judgment dismissing Appellees' claims against Appellants for lack of personal jurisdiction.

/s/ Lee Gabriel

LEE GABRIEL
JUSTICE

PANEL:  WALKER, MEIER, and GABRIEL, JJ.

DELIVERED:  November 17, 2016